UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x

UNITED STATES OF AMERICA,

                 Plaintiff,

  - against -

SAMUEL MOORE,

                 Defendant.
----------------------------------------------------------x

**REPORT AND RECOMMENDATION**
21-CR-270-WFK-SJB

**BULSARA, United States Magistrate Judge:**

      Samuel Moore ("Moore") was arrested in the lobby of a New York City Housing Authority ("NYCHA") building following a *Terry* stop and frisk that led to the discovery of a semiautomatic pistol in his jacket pocket. Moore has moved to suppress the pistol and its ammunition, arguing that New York City Police Department ("NYPD") officers lacked reasonable suspicion to stop him, and any subsequent search of him was, therefore, illegal. (Notice of Mot. to Suppress dated Oct. 27, 2021, Dkt. No. 10; Mem. of Law dated Nov. 30, 2021, Dkt. No. 11). The Court held an evidentiary hearing on May 9, 2022, and the parties completed briefing on May 31, 2022. (Min. Entry dated May 9, 2022). For the reasons explained below, the Court respectfully recommends that the motion to suppress be denied.

      There is little to no dispute about the facts leading up to Moore's stop, search, and arrest. The merits of the motion turn almost entirely on whether anonymous 911

calls here can create the reasonable suspicion necessary to justify a *Terry* stop.  Before turning to that legal question, some recitation of facts is necessary.[1]

On May 10, 2021 NYPD Officers Joshua Raime, Kasey Wallace, and Michael Page were serving as patrol officers in Brownsville, New York, assigned to NYCHA buildings in the area, including 315 Livonia Avenue.  (Opp'n to Mot. to Suppress dated May 23, 2022 ("Gov't Post-Hr'g Opp'n"), Dkt. No. 20 at 1; Tr. of Evidentiary Hr'g dated May 9, 2022 ("Hr'g Tr."), attached as Ex. A to Gov't Post-Hr'g Opp'n at 4:5-10, 5:10, 5:17-19, 57:1-4, 58:3-5, 71:16, 73:20-25, 74:1).

At approximately 1:30 a.m. on May 10th, a dispatcher, after hearing from a 911 caller, reported that there was a "suspicious male with a firearm" in the building.  (Tr. of Radio Transmission dated May 10, 2021 ("Radio Transmission"), Gov't Ex. 104-T at 2:6-7).  Page responded and began making his way to 315 Livonia Avenue.  (Hr'g Tr. at 74:4-18, 78:10-11).  The dispatcher then conveyed that the incident was a "52 with a firearm," *i.e.,* a dispute with a firearm.  (Radio Transmission at 2:26-27; Hr'g Tr. at 78:15-17).  The suspect was described by the dispatcher as "black, bald headed wearing a black jacket and blue jeans."  (*Id.* at 2:44-45).  Page asked the dispatcher whether the 911 caller had seen the firearm.  The dispatcher responded "[I]t says it sounds like a dispute, I'll check

---

[1] Moore's recitation of the facts at times cites to the transcripts of the 911 calls themselves.  The Court does not cite to or rely on the transcripts of these calls because these calls were made to the 911 dispatcher, and the dispatcher then related information to the officers.  Whether the officers had reasonable suspicion to stop Moore turns only on the information they received from the dispatcher.  *United States v. Simmons*, 560 F.3d 98, 107 n.3 (2d Cir. 2009) ("[T]he investigative stop cannot be justified based on information that the 911 caller provided to the operator, but that was not communicated either to the dispatcher or to the investigating officers prior to the stop.") (citing *United States v. Colon*, 250 F.3d 130, 138 (2d Cir. 2001)).

the callback, I'll . . . ascertain." (*Id*. at 3:10-13).  The 911 caller called again.  (*Id*. at 3:26-27; Hr'g Tr. at 51:3-14).

At 1:31 a.m., the dispatcher first reported that the suspect was "in the lobby of the location."  (Radio Transmission at 3:1-2).  Approximately one minute later, at approximately 1:32 a.m., the dispatcher reported that "now they're saying the 12th floor or hallway."  (*Id*. at 3:21, 3:25-26).

Page and Raime arrived at the front door to the lobby of 315 Livonia Avenue at approximately 1:32 a.m.  (Tr. of Raime Body Camera Video dated May 10, 2021 ("Raime Body Cam Tr."), Gov't Ex. 101-T at 1; Raime Body Camera Video dated May 10, 2021, Gov't Ex. 101; Hr'g Tr. at 12:12-18).  Moore was in the lobby and appeared to be arguing with individuals in or near the elevator, (Hr'g Tr. at 16:24-17:25, 75:16-22), and some shouting and yelling is audible and appears to be coming from the lobby.  (Raime Body Cam. Tr. at 2:5).  The two officers saw Moore yelling or shouting.  (Hr'g Tr. at 75:12-19).  Raime and Page described what they heard as "arguing," "yelling," or "loud talking."  (*Id*. at 16:24, 17:20-23, 33:20, 34:3, 46:5, 74:16-18; 75:8).  Moore says he was "speaking."  (Def. Post-Hr'g Mem. at 3).  Raime testified that around 1:33 a.m. he heard a woman saying, "We're good."  (Raime Body Cam Tr. at 2:11; Hr'g Tr. at 45:1-6 ("I'm good")).  An unnamed officer responding to the scene asked Raime, "They playing?" and Raime responded, "She's arguing."  (Raime Body Cam Tr. at 2:17-19).

The officers did not see any acts of violence, any ongoing physical altercations, or a firearm as they approached.  Nor did they hear any threats.  (Hr'g Tr. at 46:3-8, 88:14-17).  And the individual or individuals in the lobby elevator did not signal for police assistance, though they could see the officers from the lobby.  (*Id*. at 48:1-6).

Approximately 15 seconds after the officers approached the lobby door—during which time they were banging on the door to get someone to open it, (Raime Body Cam Tr. at 2:7 ("knocking"))—Moore opened the door and walked back into the lobby in the direction of an elevator. (Hr'g Tr. at 18:2-4, 19:1-4, 34:12, 75:12). The elevator had closed by this point. (*Id*. at 19:7-9). Additional officers had also arrived at the scene, and they too entered the building. Moore attempted to walk by them—Page described it as Moore trying to "squeeze by" them—out of the building. (*Id*. at 75:9-15, 75:25). Page and another unnamed officer directed Moore to stop and remain in the lobby. (Tr. of Page Body Camera Video dated May 10, 2021 ("Page Body Cam Tr."), Gov't Ex. 102-T at 2:31-22 ("Officer 4: No, no, no, stay right here for me. Officer 1: Hang tight, hang tight."); Page Body Camera Video dated May 10, 2021, Gov't Ex. 102; Hr'g Tr. at 76:13). Page believed that Moore matched the person described by the dispatcher since he was a black male with a bald head, wearing jeans and a black jacket. (Hr'g Tr. at 76:4-8). No one else in the vicinity matched this description. (*Id*. at 92:18-22).

When Moore tried to "squeeze by" the officers after opening the door to the lobby, Moore had his hands in his pockets. (Hr'g Tr. at 18:16-17 ("He had his hand in his pockets"); *see also* Still Photograph from Raime Body Cam Video dated May 10, 2021, Gov't Ex. 101-B). As Page told Moore to stop and remain the lobby, Moore had his hands in his pockets. (Hr'g Tr. at 76:15-16 ("He did stop and backed up a little bit, and put his hands in his pocket.")). Page told him to remove them. (Page Body Cam Tr. at 2:39-40 ("Keep your hands out of your pockets for me, please. Stand over here."); *see also* Still Photograph from Page Body Cam Video dated May 10, 2021, Gov't Ex. 102-D). Moore complied. (Hr'g Tr. at 59:4-7 ("One of my fellow officers told the defendant to take his hands out of his pockets as soon as I arrived. The defendant took his hands out

of his pockets and put the hands back in his pockets.")).  Page then asked Moore who he was arguing with.  (Page Body Cam Tr. at 3:4-5).  Moore denied arguing with anyone. (*Id*. at 3:7).  Page then asked Moore again who he was talking to.  (*Id*. at 3:9).  Moore replied: "I don't know the exact floor that they on.  But, it's a girl.  She's going through what they going through.  Her and her brother.  So I tried to get they going through what was going on.  That was all."  (*Id*. at 3:15-19).  Moore then put his hands back in his pockets, and Page told him to take his hands out of his pockets.  (*Id*. at 3:21-22).  Moore complied.  Almost immediately, Moore put his hands back in his pockets, and Wallace again told Moore to remove his hands and put them by his side.  Moore complied.  (*Id*. at 3:25-26; Hr'g Tr. at 59:4-9).

Raime told Moore to turn around and face the wall, and then he and other officers began a pat-down of Moore.  (Hr'g Tr. at 19:18-23).  In patting down Moore's jacket, Wallace felt the trigger guard of a firearm and found a .380 semiautomatic Ruger pistol in Moore's right-side jacket pocket.  (*Id*. at 59:16-19).  Moore was then arrested. (*Id*. at 86:8-10, 23).

"[A] brief investigatory stop may sometimes reasonably be conducted in the absence of a warrant and even of the probable cause required for a lawful arrest." *United States v. Patterson*, 25 F.4th 123, 135 (2d Cir. 2022) (*citing Terry v. Ohio*, 392 U.S. 1, 20 (1968)).  "[I]n appropriate circumstances and in an appropriate manner," *Terry*, 392 U.S. at 22–23, such *Terry* stop permits an officer "both temporarily to detain a person and pat him down for weapons[.]"  *Patterson*, 25 F.4th at 135.  Circumstances are "appropriate" to justify the *Terry* stop if the officer has "reasonable suspicion," *i.e.* a "reasonable basis to think that the person to be detained is committing or has committed a criminal offense."  *Id.* (quotations omitted).  "[I]n evaluating whether an

officer has reasonable suspicion that a suspect is armed, courts must look at the totality of the circumstances confronting the officer, as viewed objectively by a reasonable and cautious officer on the scene, " *United States v. Weaver*, 9 F.4th 129, 134 (2d Cir. 2021) (en banc), "whose insights are necessarily guided by the officer's experience and training, as well as commonsense judgments and inferences about human behavior." *Id.* at 140 (quotations and alterations omitted).  "[R]easonable suspicion requires more than a 'hunch'" but "is satisfied as long as authorities can point to 'specific and articulable facts which, taken together with rational inferences from those facts,'" *Patterson*, 25 F.4th at 136 (quoting *Terry*, 392 U.S. at 21), "provide a 'particularized and objective basis for suspecting legal wrongdoing[.]'" *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

This reasonable suspicion standard is "'not high.'" *Id.* (quoting *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997)).  That is, "the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than the is necessary for probable cause[.]" *Navarette v. California*, 572 U.S. 393, 397 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

"[A] person's compliance with an officer's order to stop where a reasonable person would not feel free to leave is a seizure, and sets the point in time for evaluating the presence of reasonable suspicion for the stop." *United States v. Simmons*, 560 F.3d 98, 107 (2d Cir. 2009).  Events that occur after an individual is seized "do not factor into the analysis of reasonable suspicion for the initial stop." *Id.*  However, such events after an officer "justifiably initiated the stop" may provide "an additional reason to conduct the patdown search." *Id.* at 109.  Here, Moore was stopped when he attempted to "squeeze by" the officers in the lobby and exit the lobby and, as the body cam footage

revealed, was prevented from doing so by officers telling him to stop and physically preventing him from exiting the lobby.  *See Weaver*, 9 F.4th at 142 n. 50 ("Telltale signs of a 'seizure' or 'stop' include the 'presence of several officers, the display of a weapon by an officer, some physical [unsearching] touching of the person . . . , or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'") (quotations omitted) (alterations in original).

The Court, therefore, evaluates whether the officers had reasonable suspicion at that time.  In making that determination, the Court must evaluate "both the content of the information possessed by police and its degree of reliability."  *Navarette*, 572 U.S. at 397 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).[2]

Prior to seizing Moore in the lobby of 315 Livonia Avenue, the officers here knew the following:

1.  A 911 caller had reported a "suspicious male with a firearm."

2.  Police dispatch had relayed there was a "dispute" with a firearm.

---

[2] Both sides agree the question for the Court is whether this initial *Terry* stop was lawful.  Moore was seized when he obeyed Page's instruction not to leave the building. *See Simmons*, 560 F.3d at 106 ("The facts of this case . . . involve an order to stop, compliance with that order, and a 'seizure' at the moment Simmons complied with the order.").  Moore does not challenge the reasonableness of the pat-down and search following the stop.  (*See* Post-Hr'g Mem. of Law dated May 23, 2022 ("Def.'s Post-Hr'g Mem."), Dkt. No. 21 at 5).

3. The location of the dispute was 315 Livonia Avenue.[3]

4. The person described was a male, "black, bald headed wearing a black jacket and blue jeans."

5. The person was either in the lobby or the 12th floor or hallway.

6. It was uncertain whether the caller had actually seen a firearm.

7. There was arguing or loud shouting audible from outside of the lobby.

8. The dispatcher's call came in at around 1:30 a.m. and Moore was found in the lobby at around 1:32 a.m.

9. Moore matched the description of the person described by the dispatcher.

10. Moore had his hands in his jacket pockets when police first encountered him in the lobby; and

---

[3] The Government also relies on the fact that the dispatcher reported that this was a building with "a history of domestic incidents and incidents involving emotionally disturbed persons." (Gov't Post-Hr'g Opp'n at 2). Page testified that this was a "high crime" area, for which he gave his own definition as a location with "shootings, assaults, robberies, [and] domestic violence." (Hr'g Tr. at 73:9-13). To be sure, testimony about a "high crime area" may be relevant to establishing reasonable suspicion. *Weaver*, 9 F.4th at 151 n. 86. But mere reference to a high-crime neighborhood or similar facts or labels "is not a substitute for analysis of the underlying testimony." *United States v. Freeman*, 735 F.3d 92, 101 (2d Cir. 2013). At the hearing on this motion, none of the officers explained why such general information would be helpful or how it specifically affected them in this case. None of the officers, in describing why they stopped Moore or approached him, testified that they relied on the supposed history of the building or the area in explaining the actions they took. Instead, the testimony about these features was provided as background about the location at the outset of testimony and never connected back to the actual stop of Moore or their decisions upon receipt of the 911 call. Furthermore, even as background, their answers to these questions about the neighborhood came across as rehearsed and as an attempt to invoke the high-crime neighborhood "doctrine," rather than as a recounting of the events and their state of mind on the day in question. The Court finds the testimony in this regard to be entitled to no weight. *See id.* at 102 (assigning no "probative value" to incredible testimony regarding a "high crime area").

11. Moore tried to move past the officers to exit the lobby.[4]

*See supra* at 2–4.  Assuming this information is reliable, these facts are enough to justify a *Terry* stop of Moore—that is, there are enough "facts sufficient to give rise to a reasonable suspicion that criminal activity may be afoot." *Patterson*, 25 F.4th at 136 (quoting *United States v. Bailey*, 743 F.3d 322, 332) (further quotations omitted).

Indeed, this case is virtually identical to *Simmons*, and as such, the same result follows.  In *Simmons* officers received a "radio dispatch informing them that an assault, possibly with a weapon, was in progress at a nearby apartment building."  560 F.3d at 101.  The dispatcher reported the description of the suspect a "a male black, wearing a grey hoody, black jacket."  *Id.* (quotations omitted).  When the officers arrived, a group of people were outside the building.  *Id.*  The officers did not see anyone being assaulted or any evidence of an assault having been committed.  *Id.*  One officer then peered into the window of the building lobby where there were three individuals, including the defendant Simmons.  *Id.* at 101.  "Simmons, a black male was wearing a gray, hooded sweatshirt and a black jacket.  There was no indication from the officers' initial observations that Simmons was engaged in an assault in progress."  *Id.* (quotations omitted).  After the officers entered the lobby, Simmons began walking towards them and continued doing so after being told to stop, and only after being told to stop a second time did he do so.  *Simmons*, 560 F.3d at 101.  Simmons refused two orders to

---

[4] "The grounds for a stop must exist at the time of the seizure."  *Simmons,* 560 F.3d at 107.  As noted, when Moore was told to stop, he was attempting to leave and had his hands in his pockets, which led officers to tell him to remove them.  The events afterwards—including the repeated directions to remove his hands and his nonsensical answers to the officers' questions—do not factor into determining whether reasonable suspicion existed for the initial stop and seizure.  *Id.*

remove his hands from his pockets, after which point an officer grabbed him, felt a gun butt in his jacket, and conducted a full pat down search. *Id.*

The Court of Appeals found there was reasonable suspicion. Noting it was a close case, it reasoned that "[r]esponding to a dispatch that communicated the 911 caller's report of an assault in progress, possibly involving a weapon, the officers, despite not finding evidence of an assault in progress, confirmed that Simmons' appearance matched the description of suspect and that Simmons was present at the specified location[,]" is sufficient to conduct a *Terry* stop. *Id.* at 107–08.

That is the present situation. Moore was found in the precise location identified by the dispatcher—the lobby of 315 Livonia Avenue—and matched the description of a bald, black male wearing a black jacket and jeans—within minutes of receiving the call from the dispatcher. Moore argues, however, that these facts were "too vague" to provide the necessary reasonable suspicion. (Def.'s Post-Hr'g Mem. at 11–12). He contends that a description of a "bald, black man" wearing a "black jacket and blue jeans" was so generic as to be meaningless because the descriptor could apply to many people who live in the 73rd Precinct where these officers were patrolling. (*Id.* at 11). The argument has no merit.[5]

---

[5] Moore also argues that because he was wearing black and not blue jeans, the description from the dispatcher could not have led officers to reasonably suspect him of any illegality. The difference between blue and black jeans is not a stark one. And in any event, the force of the other facts and circumstances are sufficient to find reasonable suspicion. *United States v. Jackson*, 652 F.2d 244, 248 (2d Cir. 1981) ("Detective Young's initial observation revealed that the age, race, hairstyle, and coat color of the driver all appeared to match the description of the robber. Although closer observation of Jackson during the investigative stop indicated that he was not wearing the exact clothing ascribed to the robber, Judge Curtin properly found that Young had reasonably believed that the driver fit the description of the robber.").

To be sure, devoid of any context, a description of a person only by his race (a black man) wearing jeans and a dark jacket, is not an individualized description. Indeed, on a New York City street, such a description would bring thousands of people under police suspicion. But that is not what we have here. Officers were given a very specific location—315 Livonia Avenue—and a place within the building—either the lobby or the 12th floor—of where to find an individual matching the description. And when they arrived on location, there were at most three people present (one in the lobby proper and either one or two in the elevator, one of whom was a woman), and only one who matched the description: Moore. It was also at around 1:30 a.m., and while at other times of day or night, the location could be teeming with people, the body cam footage showed what amounts to a virtually deserted location with no one present but Moore. And Moore was found within a couple of minutes of officers receiving information from the dispatcher. So while in the abstract, the description of a bald, black man wearing jeans and a dark jacket would bring countless people in New York City under reasonable suspicion, that is not this case. The description is no more specific than it was in *Simmons*—where the defendant was a black male, wearing a grey hoodie and a black jacket—but the surrounding context—the specific location, time of day, proximity to the dispatch report, and the absence of any other individuals in the area—is sufficient to establish reasonable suspicion to justify the stop.

Moore's other attempts to distinguish *Simmons* are unpersuasive. Moore attempts to argue that there was no longer an emergency or an ongoing dispute. (*See* Def.'s Post-Hr'g Mem. at 9–10). This argument simultaneously downplays the situation here and misapprehends *Simmons*. Moore focuses on the fact that, when officers first approached the lobby, there was some confusion about what was going on—one officer

asks whether the individuals were "playing," (Raime Body Cam Tr. at 2:17), to which another officer responds that they were "arguing." (*Id.* at 2:19).[6] At a minimum, on the body cam footage you hear loud shouting or yelling. (*Id.* at 2:5 ("[Yelling]")). The point is that any confusion about what was going on did not suggest that the emergency had dissipated, even if the officers did not see a "dispute" in progress. In *Simmons,* when the officers appeared, there was no evidence of an ongoing assault, or even evidence of a prior altercation. 560 F.3d at 101. Nonetheless, police were permitted to stop the defendant because they had not yet confirmed that the emergency had dissipated. *Id.* at 108. Officers in responding to a 911 call need not come upon a crime-in-progress to have reasonable suspicion. And critically, the dispatcher had reported a dispute with a firearm, not just a dispute. Police reasonably could have inferred—after finding the person described in the precise location mere minutes after the radio dispatch—that Moore was potentially an ongoing threat, because he was someone with a gun, and that they needed to stop him to investigate further.

And none of the cases cited by Moore are to the contrary. In *Dancy v. McGinley*, the police stopped two individuals following reports of a robbery. The suspect was described as "thin, black male wearing a brown jacket" who was "traveling in an unknown direction." 843 F.3d 93, 109 (2d Cir. 2016). The Court of Appeals found that there was no reasonable suspicion as to either person detained. *Id.* at 108–09. The first person was detained because of his proximity to the other person matching the description. *Id.* at 109. That is not the situation here, since Moore was not in proximity

---

[6] Contrary to Moore's suggestion, (*see* Def.'s Post-Hr'g Mem. at 9), the officer did not say that the individuals were "playing" but rather was inquiring whether they were. Raime answers in the negative, by indicating they are arguing.

to the alleged perpetrator, he was the alleged perpetrator.  As for the second person stopped in *Dancy*, he only "somewhat" matched the description, according to the officer. *Id.* at 101, 109.  In fact, he was wearing a camouflage-colored jacket—not the "brown jacket" described by the dispatcher.  *Id.* at 109.  In addition, the Court noted that it was not unusual to find a black man on the streets of downtown Poughkeepsie at that time of night on a Friday evening.  *Id.*  And, furthermore, neither exhibited any suspicious behavior.  *Dancy*, 843 F.3d at 110 ("Officer McGinley did not suggest that they appeared nervous, attempted to conceal anything, changed direction, ran away, quickened their pace, or made furtive gestures.").

The comparison to Moore is inapt.  Unlike in *Dancy*, where the individuals stopped were found only in close proximity to the location of an attempted robbery—and even by the officer's description only "somewhat" matched the description of the alleged robber—Moore was in the exact location described, one of only three people in the area, and matched the description provided by the dispatcher.  And unlike the individuals stopped in *Dancy*, Moore was acting somewhat suspiciously.  Moore contends that someone engaged in wrongdoing would not have opened the door to the lobby, let officers in and "go about their business."  (Def.'s Post-Hr'g Mem. at 4, 5 n.3). Indeed, the officers conceded at the hearing such behavior is generally consistent with innocent conduct.  (Hr'g Tr. at 48:16-19).  That some of Moore's conduct is consistent with innocence or that in other contexts his conduct would not be suspicious is not the standard by which to judge this stop.  Reasonable suspicion "does not require authorities to eliminate all possible innocent explanations for conduct before deeming it suspicious." *Patterson*, 25 F.4th at 136 (quotations omitted).  And "[w]hen the circumstances give rise to reasonable suspicion that a suspect has a weapon, an officer

need not rule out alternative explanations—whether innocent or otherwise—for a suspect's behavior to conduct a pat-down for safety." *Weaver*, 9 F.4th at 134.

Opening the door to the lobby is not all Moore was doing. He was found in the lobby, at a minimum, shouting with or at people in an elevator. The Government says it was an argument, and at least one officer interpreted it as such, and Moore contends that he was just "speaking" with people. The body cam reveals at least some shouting. (*Supra* at 3). But that is not enough to suggest suspicious activity. What happens afterwards is. Moore tried to "squeeze by" the officers while keeping his hands quite conspicuously in his pockets. (*Supra* at 4). Such "[u]nusual, evasive, or furtive behavior, especially in the presence of law enforcement, is often a critical factor in the reasonable suspicion analysis." *Weaver*, 9 F.4th at 147 (collecting cases); *cf. United States v. Hawkins*, No. 21-836, 21-848, -- F.4th --, 2022 WL 2251885, (2d Cir. June 23, 2022) ("The officers observed that both defendants exhibited body movements they perceived to be evasive, and [an officer] . . . made the very significant observation that the defendants had their hands in their sweatshirt pockets and that doing so created tension at Diaz's waistline.") (quotations omitted) (footnote omitted).

To be sure, this behavior alone would not give rise to reasonable suspicion. Absent the 911 dispatcher information, there would be no grounds for a *Terry* stop since there is nothing wrong with someone walking by officers with hands in their pockets or giving nonsensical answers after shouting or talking loudly with someone. But here, officers had a report suggesting there was a dispute in progress with a weapon. That places Moore's shouting or loud talking in a different context. As does his attempt to avoid officers with his hands in his pockets. The dispatcher's information, coupled with the spot-on identity of Moore and the description provided by the dispatcher at the

precise location, is sufficient to create reasonable suspicion. *See Simmons*, 560 F.3d at 108 (finding defendant walking towards police with hands in pockets could reasonably be interpreted by police as someone "concealing a weapon").[7]

Moore also cites to *Ferguson v. City of New York*—where the Court found that reasonable suspicion did not exist—in which the plaintiff was described as a "short black male" and police stopped him in an "innocuous" public area, namely an elevator bank. No. 17-CV-4090, 2018 WL 3233131, at *4 (E.D.N.Y. July 2, 2018), *reconsideration granted on other grounds*, 2018 WL 3626427 (July 30, 2018). *Ferguson* is only superficially similar to Moore's case. To be sure, the arrests both took place near elevators of public buildings. However, in *Ferguson,* the arrest took place only in "general temporal and geographical proximity to the crime." *Id*. at 3. The location of the arrest was only "in the vicinity" of the reported crime, and it occurred at least 30

---

[7] Oddly, Moore relies on *United States v. Torres-Miranda* to suggest that courts find vague descriptions unlawful. But in *Torres-Miranda* the officers did not rely solely on a generalized description to apprehend the defendant, but rather his furtive behavior, and the Court upheld the *Terry* stop. *United States v. Torres-Miranda*, No. 3:19-CR-120, 2021 WL 77096, at *7 (D. Conn. Jan. 8, 2021). Moore was acting furtively or at least suspiciously, making his case closer to *Torres-Miranda* rather than unlike it.

minutes after the crime was committed.  *Id*.  It is simply not comparable to the present case.[8]

   Ultimately, however, reasonable suspicion cannot exist if the information that officers use to form that belief is unreliable.  And this is where Moore rests much of his argument.  He contends that an anonymous tip concerning a person carrying a firearm cannot establish reasonable suspicion because such tips, absent corroboration, are unreliable.  (Def.'s Post-Hr'g Mem. at 5–8).  Unfortunately, Moore misapprehends the law and its application to his case.

   As a threshold matter, Moore's contention that the arrest was based on an "anonymous tip" leaves out a critical element: it was a call to a 911 operator.  And this, off the bat, makes this case different from *Florida v. J.L.*, 529 U.S. 266 (2000), the principal case that Moore relies upon.

   In *J.L.*, an anonymous caller directly called the Miami-Dade Police reporting that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun."  529 U.S. at 268.  There was no audio recording of the tip and nothing was known about the informant.  *Id*.  And sometime later, police were told to respond

---

   [8] The remaining cases cited by Moore are inapposite.  In *Massillon v. Conway*, reasonable suspicion was not an issue; the more difficult-to-satisfy probable cause standard was litigated because the defendant was arrested, not subject to a *Terry* stop.  574 F. Supp. 2d 381, 395–96 (S.D.N.Y. 2008).  And in *United States v. Jones*, the 10th Circuit found no reasonable suspicion because the vehicle they stopped bore *no* resemblance one described by the informant.  998 F.2d 883, 885 (10th Cir. 1993) ("There were many aspects of the vehicle they found which suggested this was not the car they were looking for.  They were searching for armed men fleeing the scene of a disturbance.  Yet the car they intercepted (a) contained a six- or seven-year-old girl, (b) was not travelling from the direction of the disturbance, (c) was on a street that, by the officers' own admission, could only be reached from the disturbance by a circuitous route, and (d) promptly parked in front of a grocery store.") (footnotes omitted).

and arrived at the bus stop and saw three black males. *Id.* "Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements." *Id.* Nonetheless, one of the officers approached J.L. and proceeded to frisk him, recovering a firearm in the process. *Id.*

Because "the officers' suspicion that J.L. was carrying a weapon arose . . . solely from a call made from an unknown location by an unknown caller[,]" the validity of the *Terry* stop turned entirely on whether the tip had sufficient indicia of reliability. *Id.* at 270. The Court concluded that the anonymous tip lacked "moderate indicia of reliability[:]" it "provided no predictive information and therefore left the police with means to test the informant's knowledge or credibility." *J.L.*, 529 U.S. at 271. As such, it found no basis for the *Terry* search. *Id.* at 273.

Moore attempts to apply the analysis from *J.L.* to his case. But it does not work. For one thing, as noted, the tip here was not an anonymous one; it was provided over a 911 recorded line. For anonymous 911 calls that precede a *Terry* stop, a different analysis applies: the one articulated by the Supreme Court in *Navarette v. California*. The Court noted that 911 calls may be "sufficiently reliable" to credit an anonymous allegation and justify a *Terry* search. *Navarette*, 572 U.S. at 398. At issue was a 911 call, which was relayed to a California Highway Patrol dispatcher, reporting details of a truck that had run the caller off the road five minutes before the call. *Id.* at 395. Based on the dispatcher's information, approximately 20 minutes later, an officer pulled over the petitioners' truck, and after smelling marijuana, two officers conducted a search. *Id.*

The Court found that three aspects of the caller's information provided the necessary reliability to justify the search. *First,* the caller claimed eyewitness knowledge

and "[t]hat basis of knowledge lends significant support to the tip's reliability." *Id.* at 399. *Second*, the caller reported the incident right after she had been run off the road, and such a "contemporaneous report has long been treated as especially reliable." *Id.* And *third*, the use of the 911 system, and its features that permit "identifying and tracing callers," provided "some safeguards against making false reports with immunity." *Id.* at 400.

Here, all three were present. The dispatcher conveyed to officers what appears to have been an eyewitness report ("suspicious male with a firearm"); that was contemporaneous ("it sounds like a dispute"); and made over the 911 system, which was a recorded and traceable line. (Radio Transmission at 2:6-7; *id.* at 3:10-13). (Indeed, after Moore's arrest, they were able to speak to the caller. (Gov't Mem. of Law in Opp'n to Mot. to Suppress dated Dec. 22, 2021, Dkt. No. 15 at 4)).

To be sure, the dispatcher was attempting to verify whether the caller had actually seen a firearm. (Radio Transmission at 3:10-13). But mere uncertainty about seeing the weapon does not nullify the overall reliability of the caller's information. And because he was providing information about an ongoing emergency on the 911 system, there were other indicia of reliability. *Simmons*, 560 F.3d at 108 ("[A] 911 call reporting an ongoing emergency is accorded a higher degree of reliability and requires a lesser suggestion of corroboration.").

Furthermore, unlike in *J.L.*, where the officers saw no suspicious behavior upon arrival, *J.L.*, 529 U.S. at 268, Moore's behavior was consistent with someone who may have had a firearm. He quite visibly had his hands in his pockets, which suggested to the officers he was carrying a firearm. *See Simmons*, 560 F.3d at 108 ("Officer McHugh did not observe any threatening behavior by Simmons. Yet, as the officers entered the

building, Simmons was walking toward them with his hands in his pockets.  This conduct could have suggested to the officers that Simmons was concealing a weapon, especially since the dispatcher reported that the suspect may have perpetrated an assault with a weapon based on information in the 911 call.") (internal citations omitted).

Moore's arguments about *Navarette* lack merit.  Citing to the dissenting opinion, Moore argues that the reliability of a 911 call turns on the "caller's state of mind," (Def.'s Post-Hr'g Reply Mem. of Law dated May 31, 2022, Dkt. No. 22 at 2), and a court should not presume reliability based on the mere fact that it was made on the 911 system.  A dissenting opinion, of course, has no operative legal effect.[9]  And the argument attacks a straw-man: *Navarette* does not establish a *per se* rule that 911 calls are always reliable.  Instead, it is one fact among many, including whether the call is contemporaneous and based on an eyewitness report, that the officer should consider in evaluating reliability.  Those other factors each point to reliability in this case.

And Moore does not explain—nor can the Court discern—how focusing on the caller's "state of mind" changes the result here.  The caller here was quite clearly reporting an ongoing incident in *his* building, and as such, even if he did not know that 911 calls were recorded, would have understood that he could not make a false report with impunity.  Moore similarly contends that the 911 call was also unreliable because

---

[9] Moore's suggestion that the Second Circuit has adopted a "state of mind" requirement for 911 calls misreads *United States v. Twiss*, 758 F. App'x 127, 129 (2d Cir. Jan. 3, 2019) (corrected opinion).  In *Twiss*, the callers asked that the 911 call *not* be recorded, and the defendant used this to argue the call was not reliable because it suggested that the callers were trying to mislead the police.  By addressing this argument, the Circuit was not suggesting that before relying on a 911 call, the police must always inquire whether the tipsters affirmatively acknowledged that their call was being recorded.

the caller hung up when asked for his last name and number.  (Recording of 911 call, attached as Ex. A to Weil Decl. dated Dec. 9, 2021, Dkt. No. 13 at 1:08-1:10).[10]  Moore attaches too much significance to this fact.  For one thing, it does not mean that the call was untraceable or went unrecorded; indeed, immediately after Moore's arrest, officers interviewed the caller.  (Gov't Mem. of Law in Opp'n to Mot. to Suppress dated Dec. 22, 2021, Dkt. No. 15 at 4).  The ability to record the 911 call and trace it ensures its reliability, not whether the caller voluntarily gives over contact information or declines to do so.  *United States v. Swinney*, 28 F.4th 864, 867 n. 3 (7th Cir. 2022) ("Swinney points out that the police did not, in fact, know the call was traceable because they were informed by the dispatcher that there was 'no number on the callback.'  But . . . . there does not appear to be a dispute that the 911 system still recorded the call and captured the caller's phone number.").

　　Besides erroneously relying on *J.L.*, Moore argues that when officers arrived, any "emergency" had dissipated, and as a result, any reasonable suspicion of Moore was gone.  (Def.'s Post-Hr'g Mem. at 10).  In support of this argument, Moore relies on *United States v. Freeman*, 735 F.3d 92 (2d Cir. 2013).  Moore's argument misapprehends *Freeman*.  In *Freeman*, the Second Circuit found that reasonable suspicion was lacking where the NYPD relied on two 911 calls about a man with a gun. *Id.* at 94.  "The caller told the 911 operator that a Hispanic male, wearing a black hat and white t-shirt had a gun, near the Chase Bank on East Gun Hill Road in the Bronx, New York."  *Id.*  The officers asked the dispatcher to verify that the caller did in fact see a gun; the dispatcher tried multiple times to do so but could not.  *Id.*  When the officers came

---

[10] The time stamp used here reflects the minute and second of the audio recording excerpt when played in a media player.

upon the defendant, Freeman, he was not attempting to run from police and simply kept walking; nor was there any indication of a firearm. *Id.* at 95.

Relying on *J.L.*, the Second Circuit concluded that because anonymous tips without corroboration lacked sufficient reliability to justify a *Terry* stop, the police had no reasonable suspicion to stop Freeman. *Id.* at 97–98. In so doing, the Court rejected the argument that the inherent features of the 911 system, including the recording of calls, ensured the reliability of the information because without knowing who the caller was, there was no way to assess his reliability. *Freeman*, 735 F.3d at 98 ("[E]ven though the call was recorded, the two factors that distinguish tips from known and unknown sources are both still operative in this case—the caller's credibility cannot be assessed and there is no risk of consequences for a false report in this instance.").

The problem for Moore is that *Freeman*'s analysis of 911 calls—suggesting they are insufficiently reliable because they provide no insight into the caller's credibility—is not good law. *Freeman* was decided in 2013, a year before the Supreme Court upheld the reliability of anonymous 911 calls in *Navarette*. 572 U.S. at 400 ("Another indicator of veracity is the caller's use of the 911 emergency system. A 911 call has some features that allow for identifying and tracing callers, and thus provides some safeguards against making false statements with immunity.") (internal citations omitted). The Supreme Court ultimately concluded that "[t]he caller's use of the 911 system is therefore one of the relevant circumstances that, taken together, justified the officer's reliance on the information reported in the 911 call." *Id.* at 401. And the call here—because it was a contemporaneous, eyewitness report using the 911 system—satisfies the *Navarette* standard for reliability.

But even if *Freeman*'s standard for 911 calls remained applicable, Moore would still not prevail.  *Freeman* noted that *emergency* 911 calls were entitled to different treatment: "[A]n anonymous 911 call reporting an ongoing emergency is entitled to a higher degree of reliability and requires a lesser showing of corroboration than a tip that alleges general criminality."  735 F.3d at 100 (quoting *Simmons*, 560 F.3d at 105).  This case presents precisely such an emergency 911 call: the dispatcher reported an ongoing "dispute with a firearm" and said "it sounds like a dispute[.]"  (Radio Transmission at 2:26-27; *id*. at 3:10-13).  Indeed, as noted earlier, this case is factually indistinguishable from *Simmons*, *supra* at 9–10, the case *Freeman* relies on to note that emergency 911 calls are treated differently.

As such, the Court concludes that police officers had reasonable suspicion to stop Moore in the lobby of 315 Livonia Avenue and conduct a *Terry* stop and frisk.  As such, the Court respectfully recommends that the motion to suppress be denied.

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), either party may object to this Report and Recommendation within 14 days of the date of service of this Report. Failure to object to this Report and Recommendation in accordance with Rule 59 may waive a party's right to review.  *See* Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1); *United States v. Ballares*, 317 F. App'x 36, 38 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object." (quoting *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997)).

SO ORDERED.

/s/ *Sanket J. Bulsara*  June 30, 2022
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York