```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA,            :
                                     :
              Plaintiff,             :
                                     :         MEMORANDUM & ORDER
      v.                             :         21-CR-270 (WFK)
                                     :
SAMUEL MOORE,                        :
                                     :
              Defendant.             :
-----------------------------------------------------------------X
```

**WILLIAM F. KUNTZ, II, United States District Judge:**

Samuel Moore moved to suppress a gun and ammunition the police found during a stop and frisk, claiming the search was unconstitutional. But the officers had reasonable suspicion to search him. They had a tip from an anonymous 911 caller that a person that looked like Moore was armed and was involved in an ongoing emergency in a high crime area; they found Moore in the building minutes after the call; Moore tried to evade the police; and Moore repeatedly refused to remove his hands from his hands, as if hiding something.

Magistrate Judge Sanket J. Bulsara reviewed Moore's motion and recommended the Court deny it. Because the Court agrees the search was reasonable, it adopts Magistrate Judge Bulsara's recommendation (with two modifications) and denies the motion.

## BACKGROUND

On the night of May 10, 2021, around 1:30 A.M., New York City Police Department Officers Michael Page and Joshua Raime were on patrol when they received a call from a 911 dispatcher: a "suspicious male" had a gun and was involved in a dispute. Report and Recommendation ("R&R") at 2, ECF No. 27. The dispatcher described the man as "black, baldheaded wearing a black jacket and blue jeans." *Id.* The dispatcher also reported the suspect was either in the lobby, hallway, or the 12th floor of 315 Livonia Avenue, a NYCHA building located in an area known for crime. *Id.* at 2-3; *see id.* at 8 n.3 (recounting Officer Page's testimony that the building was in a "high crime area" with a history of "shootings, assaults, robberies, [and] domestic violence.").

Officers Page and Raime arrived at the building two minutes later. *Id.* at 3. At the lobby, they spotted Moore, who matched the description given by the dispatcher.[1] *Id.* at 3. The officers observed Moore arguing with and shouting at several people near the elevator. *Id.* at 3, 13. Around 1:33 A.M., Officer Raime also heard a woman saying, "we're good." *Id.* at 3. The officers knocked on the lobby door, and Moore opened it. *Id.* at 4. Moore walked back into the lobby in the direction of an elevator, which had closed. *Id.* Moore then attempted to "squeeze by" the officers and exit the building with his hands in his pockets. *Id.*

Officer Page ordered Moore to stop and remove his hands from his pockets. *Id.* For a moment, Moore complied. But then he put his hands back in his pockets. *Id.* at 4-5. This exchange continued two more times: on both occasions, Officer Page would ask Moore to take his hands out of his pockets; Moore would comply but put his hands back in his pockets immediately after. *Id.* at 5. The officers then searched Moore, found a .380 semiautomatic Ruger pistol in his jacket pocket, and arrested him. *Id.* at 5.

Moore was charged with being a felon in possession of a firearm under 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He moved to suppress the gun and ammunition, claiming the officers did not have reasonable suspicion to search him. *See* Mot. to Suppress, ECF No. 11. Thus, he argued, the officers violated the Fourth Amendment, and the gun and ammunition should be excluded. *See id.* at 1-2, 10.

Magistrate Judge Bulsara disagreed. He found the officers had reasonable suspicion to stop and search Moore because Moore's case was "virtually identical" to *United States v. Simmons*, 560 F.3d 98, 104 (2d Cir. 2009). R&R at 9. And because the Second Circuit determined the officers in *Simmons* had reasonable suspicion, Magistrate Judge Bulsara

---

[1] With one exception: Moore was wearing black and not blue jeans. Magistrate Judge Bulsara nonetheless determined, and Moore does not challenge, that this difference is "not a stark one." R&R at 10 n.5.

2

concluded the search was also justified here. *Id.* at 10. Magistrate Judge Bulsara therefore recommended the Court deny Moore's motion. *Id.* at 22.

Moore timely objected to Magistrate Judge Bulsara's recommendation. *See* Obj., ECF No. 28.

## DISCUSSION

### I. Legal Standard

A district court's review of a magistrate judge's report and recommendation is governed by three standards. Timely objections are reviewed *de novo*. *United States v. Drago*, No. 18-CR-394 (SJF) (AYS), 2019 U.S. Dist. LEXIS 117158, at *3 (E.D.N.Y. July 15, 2019) (Feuerstein, J.) (citations omitted). Objections that are "conclusory or general . . . or simpl[e] reiterations of the original arguments" are reviewed for clear error. *See United States v. Peldomo*, No. 10-CR-69 (RRM) (ALC), 2010 U.S. Dist. LEXIS 129051, at *3 (E.D.N.Y. Dec. 6, 2010) (Mauskopf, J.) (citing cases). The findings of the magistrate judge that are not properly objected to are not reviewed unless they are "clearly erroneous." *United States v. Burke*, No. 9-CR-135 (SJ), 2011 U.S. Dist. LEXIS 71276, at *3 (E.D.N.Y. July 1, 2011) (Johnson, J.) (citations omitted). Upon review, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

Most of Moore's objections consist of the same arguments made to and rejected by Magistrate Judge Bulsara. Ordinarily, these are reviewed for clear error. But because Magistrate Judge Bulsara did not err, let alone clearly err, in determining the officers had reasonable suspicion to search Moore, the Court adopts his recommendation with two modifications.

3

**II.     Application**

    A. <u>The Officers Had Reasonable Suspicion to Search Moore</u>

Moore argues the Court must suppress the gun and ammunition because the officers did not have reasonable suspicion to search him. But the totality of the circumstances—the anonymous tip, the ongoing emergency, the matching description, the high crime area, Moore's attempt to evade the officers, and Moore's refusals to remove his hands from his pockets—was enough for a reasonable and cautious officer in the officers' shoes to conclude a crime had been committed and that Moore was "armed and dangerous." *United States v. Weaver*, 9 F.4th 129, 139 (2d Cir. 2021) (en banc).

Police officers may, of course, perform a brief investigatory stop without probable cause or a warrant. *See United States v. Patterson*, 25 F.4th 123, 135 (2d Cir. 2022) (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). But the officer must have a "reasonable basis to think that the person . . . is committing or has committed a criminal offense." *Id.* (citation and quotation marks omitted). During the stop, the officer may also conduct a frisk or a pat-down if the officer has "a reasonable suspicion . . . that the person [] is armed and dangerous." *Weaver*, 9 F.4th at 139 (citation and quotation marks omitted). That is not a high bar. *See Patterson*, 25 F.4th at 136 (citing *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997)). To get there, "'specific and articulable facts which, taken together with rational inferences from those facts,' [must] provide detaining officers with a 'particularized and objective basis for suspecting wrongdoing.'" *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).[2]

---

[2] The grounds for the stop must exist at its inception. *United States v. Swindle*, 407 F.3d 562, 567 (2d Cir. 2005). There is no dispute Moore was stopped when the officers prevented him from "squeez[ing] by" them in the lobby. R&R at 6-7.

4

Here, the officers relied on an anonymous 911 call when they stopped and searched Moore. For an anonymous tip to provide reasonable suspicion, the tip must be accompanied by a "sufficient indicia of reliability." *Simmons*, 560 F.3d at 104 (quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000)). It is not enough for the tip to accurately describe the defendant and where he is. *See J.L.*, 529 U.S. at 271. Rather, there must be "further corroboration by the police to demonstrate that the tip" is "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *United States v. Freeman*, 735 F.3d 92, 97 (2d Cir. 2013) (citing *Alabama v. White*, 496 U.S. 325, 329-32 (1990)); *see also United States v. Spencer*, 646 Fed. Appx. 6, 9 (2d. Cir. 2016) (summary order).

One indicator of reliability is the caller's use of the 911 emergency system. *See Navarette v. California*, 572 U.S. 393, 400 (2014). In *Navarette*, the Supreme Court explained that the 911 system allows for the recording, identifying, and tracing of callers, which provides "safeguards against [] false reports." *Id.* Although the Court declined to endorse all 911 calls as "*per se* reliable," it found a call made over 911 was "one of the relevant circumstances" that may "justif[y] the officer's reliance on" the tip. *Id.* at 401.

Moreover, an anonymous 911 call that reports an ongoing emergency is also "entitled to a higher degree of reliability." *Simmons*, 560 F.3d at 105. In *Simmons*, an anonymous 911 caller reported that an ongoing assault, possibly involving a gun, was taking place in a nearby apartment known for crime. *Id.* at 101. Within minutes, police officers arrived at the apartment and spotted Simmons, who matched the dispatcher's description. *Id.* As the officers entered the lobby, Simmons started to "walk[] toward them with his hands in his jacket pockets." *Id.* He also repeatedly ignored the officers' orders to stop and remove his hands from his pockets. *Id.* The officers then grabbed Simmons, searched him, and found two guns in his jacket pockets. *Id.*

Simmons moved to suppress the firearms, and the district court denied the motion. *Id.* The Second Circuit affirmed the denial and found the officers had reasonable suspicion to search Simmons. Unlike an anonymous tip about "general criminality," the anonymous 911 tip leading to Simmons's search alleged an ongoing emergency. *Id.* Those, the Second Circuit held, require a "lower" "level of corroboration" because of the "special reliability inherent in reports of ongoing emergencies" and the "greater reliability of an emergency 911 call." *Id.* at 105 (citation and quotation marks omitted). Thus, the officers had reasonable suspicion to stop Simmons because he matched the description provided by the dispatcher, he was in an area known for crime late at night, and he attempted to walk toward the officers with his hands in his pockets, as if hiding a weapon. *Id.* at 108. And because Simmons repeatedly refused to remove his hands from his pockets, the officers were justified in searching him for weapons. *Id.*

Magistrate Judge Bulsara determined the officers were justified in searching Moore because, as in *Simmons*, they "reasonably could have inferred" that Moore was committing a crime and that he was "potentially an ongoing [armed] threat." R&R at 11-14.

The Court agrees. Here, at least nine facts roused the officers' suspicions:

1. An anonymous 911 caller reported a "suspicious male with a firearm."
2. Police dispatch relayed that the man was involved in "dispute" with a firearm.
3. The location of the dispute was 315 Livonia Avenue, an area known for crime.[3]
4. The person was either in the lobby or the 12th floor or hallway of the building.
5. The dispatcher's' call came in at around 1:30 A.M., and Moore was found in the lobby just two minutes later.
6. Moore matched the description provided by the dispatcher.

---

[3] Magistrate Judge Bulsara did not rely on the crime rate of the area in reaching his conclusion. R&R at 8 n.3. But as discussed below, the Court disagrees and modifies the recommendation accordingly.

6

7. The officers observed Moore "yelling or shouting" at several people.

8. Moore tried to "squeeze past" the officers to exit the building with his hands in his pockets.

9. After he was stopped, Moore repeatedly refused to comply with the officers' orders for him to remove his hands from his pockets.

*See* R&R at 7-9. Taken together, these facts justify the search. Indeed, this case is nearly identical to *Simmons*. As in *Simmons*, the officers received a dispatch that someone that looked like Moore was armed and was involved in a late-night altercation in a high crime area. The officers' personal observations before the stop corroborated the tip: within minutes, they found Moore in the same building specified by the caller; Moore matched the description of the suspect; Moore was shouting and arguing with several people; and Moore tried to slip past the officers with his hands in his pockets. And like *Simmons*, Moore repeatedly ignored the officers' orders to remove his hands from his pockets, suggesting he was hiding something. Taken together, these facts could lead a reasonable officer to think Moore committed a crime and that he might be armed and dangerous. *See Simmons*, 560 F.3d at 108.

Moore resists this conclusion for several reasons. First, he claims he was "decidedly cooperative" before he was searched, while Simmons was not. Obj. at 5. True, Moore opened the lobby door (after being ordered to do so by the officers). But that is not all that he did. After Moore let the officers in, he was evasive. Moore first tried to walk away from the officers in the direction of an elevator. But by then, the elevator had closed. So Moore changed course: he turned back and tried to slip past the officers at the lobby entrance. And as in *Simmons*, Moore had his hands in his pockets throughout the interaction, as if hiding something. Given Moore's "[u]nusual, evasive, [and] furtive behavior," the officers were justified in stopping him. *Weaver*,

7

9 F.4th at 147; *see United States v. Hawkins*, 37 F.4th 854, 858 (2d Cir. 2022) ("[T]he officers' assessment of an individual's 'nervous' or 'evasive behavior' is 'pertinent' in establishing reasonable suspicion." (quoting *Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000)).

Next, Moore argues the *Simmons* court found the high crime rate of the area to be relevant, while here, Magistrate Judge Bulsara gave it "no weight." Obj. at 5. Magistrate Judge Bulsara correctly recognized that "testimony about a 'high crime' area may be relevant to establishing reasonable suspicion." R&R at 8 n.3. Yet he declined to credit this testimony because "none of the officers explained why such general information would be helpful or how it specifically affected them in this case." *Id.* To the extent they testified the information was useful as "background," Magistrate Judge Bulsara found their testimony was not credible. *Id.*

While Magistrate Judge Bulsara's reasoning is not without force, the Court declines to apply it. "Reasonable suspicion is an objective, not subjective, standard." *Weaver*, 9 F.4th at 140. In other words, courts must "evaluate [the] circumstances through the eyes of a *reasonable and cautious police officer on the scene*"—not whether the officers *actually* believed the area's history of crime was significant. *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) (citation and quotation marks omitted) (emphasis added). And while "the general label 'high crime area' is not a substitute for analysis of the underlying testimony," *Freeman*, 735 F.3d at 101, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *United States v. Muhammad*, 463 F.3d 115, 123 (2d Cir. 2006).

Here, the 911 dispatcher relayed to the officers that 315 Livonia Avenue was a high crime area. A reasonable officer could have credited this testimony. *See, e.g., United States v. Dekattu*, No. 18-CR-474, 2019 U.S. Dist. LEXIS 37999, at *9 (E.D.N.Y. Mar. 8, 2019) (Ross, J.)

8

(collecting cases). The Court will thus consider the high crime rate of the building as a factor and modifies the recommendation accordingly.

Finally, Moore argues his case is different because *Simmons* concerned a tip about an "assault . . . possibly involving a weapon," while his case involved a "dispute involving a firearm." Obj. at 5-6. And an assault, Moore says, invites "more urgent need for police action" than a dispute. *Id.* at 6. But that is a distinction without a difference: a dispute involving a gun is still an emergency. A loaded gun is a lethal weapon. *See United States v. Baptist*, 847 Fed. Appx. 61, 67 (2d Cir. 2021) (summary order) (quoting the district court's conclusion that "[a] loaded gun . . . is a dangerous, dangerous weapon."). And a loaded gun in a dispute, even if verbal, presents an even greater danger. An individual armed with a gun may choose to use it to end the altercation. The presence of the gun may also escalate the dispute into something more. Either way, the risk for violence requires police action to prevent catastrophe.

In short, just as in *Simmons*, the officers received a tip about a dispute involving a firearm—an ongoing emergency. And the offers had reason to believe the dispute was ongoing because they personally observed Moore arguing with and shouting at several people in the lobby. Accordingly, Moore's attempts to distinguish *Simmons* fail.

B. *Freeman* Does Not Apply

1. ***Freeman* Is Distinguishable**

Moore next argues Magistrate Judge Bulsara should have applied a different case. But the case he cites is inapt. *Freeman*, 735 F.3d 92. In *Freeman*, the Second Circuit was faced with two anonymous tips made by the same 911 caller alleging a man who was possibly armed was "arguing with a female" at an intersection. *Id.* at 94. During the first call, the tipster described the suspect as a "Hispanic male, wearing a black hat and a white t-shirt." *Id.* In the second, the

9

tipster stated the man was actually a "male black" wearing a "white du-rag, black hat, and a long white t-shirt." *Id.* at 95. Despite numerous attempts, the 911 dispatcher was unable to confirm whether the caller had seen a gun, and the caller refused to identify herself. *Id.* at 94. The officers nonetheless went to the intersection and identified Freeman, who matched the second description and was walking down a street. *Id.* at 95. Even though there was no sign an argument had taken place—or that Freeman was attempting to run or had a gun—the officers searched him. *Id.*

The Second Circuit determined the calls lacked any indicia of reliability because the caller refused to identify herself or put her "anonymity at risk." *Id.* at 98. Thus, there was "no way for the police (or for the reviewing court) to determine her credibility or reputation for honesty" or whether the "consequences for false[ly] reporting [crime over 911]" influenced her to be truthful. *Id.* Although the Court cited *Simmons* and acknowledged that 911 calls may be given a "higher degree of reliability" if they reported an "ongoing emergency," there was no such emergency. *Id.* at 100. And because the anonymous tip and the matching description were the only bases for the search, the Court found the search was unconstitutional. *Id.*; *see United States v. Spencer*, 646 Fed. App'x. 6, 9 (2d Cir. 2016) (summary order) (noting that in *Freeman*, "the only basis" for reasonable suspicion was the anonymous tip).

But this case is different: there *was* an ongoing emergency. *See supra* § IIA. And unlike *Freeman*, the circumstances of Moore's search—the matching description, the ongoing dispute, and Moore's furtive behavior—corroborated the tip. *See id.* In addition, the officers were also able to contact the 911 caller and speak with him after Moore's arrest, which the police failed to do in *Freeman*. *See Freeman*, 735 F.3d at 98; *see also* R&R at 18. These facts set Moore's case apart from *Freeman*.

10

### 2. *The Court Does Not Address Whether Freeman Is Good Law*

The parties also split ways about whether *Freeman* is still good law. Magistrate Judge Bulsara found it was not. He determined that *Navarette's* endorsement of 911 calls as an indicator of the caller's veracity could not be reconciled with *Freeman*. R&R at 21. And because *Navarette* was decided by the Supreme Court a year after *Freeman*, he concluded that *Freeman* was no longer good law. *Id.*

This logic appears to have some merit. On its face, *Navarette* found the features of the 911 emergency system that allow for the recording, tracing, and identifying of callers can enhance their reliability and "safeguard" against false reporting. 572 U.S. at 400-01. But the *Freeman* Court seems to take the opposite view. It declined to credit the reliability of anonymous calls because "[t]he fact that the caller was recorded and that the caller's apparent cell phone number is known" "leav[es] no way for the police (or for the reviewing court) to determine her credibility and reputation for honesty—one of the main reasons tips from known sources are afforded greater deference than anonymous ones." *Freeman*, 735 F.3d at 98 (citing *J.L.*, 529 U.S. at 270). Under normal circumstances, such potential "conflict, incompatibility, or inconsistency" between *Freeman* (a Second Circuit decision) and *Navarette* (an intervening Supreme Court case) would require the Court to decide if the law of the circuit is still good law. *In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 155 (2d Cir. 2015); *see United States v. Polouizzi*, 564 F.3d 142, 160 (2d Cir. 2009) ("Courts in this Circuit are bound to apply [circuit precedent] unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or this court." (citation, alterations, and quotation marks omitted)).

But these are not normal circumstances because *Freeman* neither applies nor changes the outcome of Moore's motion. The Court is also mindful that the "respect for the overall structure

11

of the federal judiciary" wisely requires it to proceed "cautiously in deciding whether an intervening Supreme Court decision overrules Second Circuit precedent." *Hoeffner v. D'Amato*, No. 09-CV-3160 (PKC) (CLP), 2022 U.S. Dist. LEXIS 98903, at *25 (E.D.N.Y. June 2, 2022) (Chen, J.). The Court exercises this caution by declining to address an issue that does not need to be decided at this time.

## CONCLUSION

For the foregoing reasons, the Court adopts Magistrate Judge Bulsara's report and recommendation with two exceptions:

- It considers the high crime rate of 315 Livonia Place; and
- It declines to address, at this time, whether *Freeman* has been overruled by *Navarette*.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 10.

SO ORDERED.

s/ WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: November 28, 2022
      Brooklyn, New York